## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

T.B. a minor, by and through her parent,
Jennifer Blankenship

        Plaintiffs,

        v.

MAD RIVER CITY SCHOOL DISTRICT
BOARD OF EDUCATION; MR. CHAD
WYEN, in his individual capacity and in his
official capacity as Superintendent of the
Mad River City School District; and Julia
Denning, Ruth Newhouse, Scott Huddle,
Cristina Pickle and Marilyn Steiner all in
their individual capacities and in their
capacities as members of the Mad River
City School District Board of Education,

        Defendants.

Civ. No. 3 : 2 1 cv 2 5 6

Judge Michael J. Newman
Magistrate Judge Peter B. Silvain Jr.

## COMPLAINT

Plaintiffs, T.B . a minor, by and through her parent, Jennifer Blankenship, *pro se*, hereby file this Complaint against Defendants, Mad River City School District Board of Education ("School Board"); Mr. Chad Wyen, in his individual capacity and in his official capacity as Superintendent of the Mad River City School District; and Julia Denning, Ruth Newhouse, Scott Huddle, Cristina Pickle and Marilyn Steiner, all individual elected officials sued in their individual capacity and in their capacity as members of the School Board (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

1

## PARTIES

1.     Plaintiff T.B. is a minor child who resides in Mad River City School District ("MRSD"), in Montgomery County, Ohio. Plaintiff T.B. is and was at all times relevant hereto a student at a Mad River City School District public school.  Suit is brought herein on T.B's behalf by his mother, Plaintiff Jennifer Blankenship.

2.     Plaintiff Jennifer Blankenship is an adult individual who is a resident and taxpayer in the Mad River City School District, in Montgomery County, Ohio. Plaintiff Jennifer Blankenship is the parent of Plaintiff T.B.

3.     Defendant Mad River City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Mayd River  City School District.

4.     Defendant Mr. Chad Wyen, was at all relevant times the Superintendent of the Mad River City School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Mad River City School District. He is sued in his official and individual capacities.

5.     Defendant Julia Denning is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity. Ms. Denning is currently the President of the School Board.

6.     Defendant Cristina Pickle, is a Montgomery County resident and member of the School Board, sued here in her individual and representative capacity.

7.     Defendant Scott Huddle is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

8.     Defendant Marilyn Steiner is a Montgomery County resident and member of the School Board, sued here in her individual and representative capacity.

9.     Defendant Ruth Newhouse is a Montgomery County resident and member of the School Board, sued here in her individual and representative capacity. Ms. Newhouse is currently the Vice President of the School Board.

10.     At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

11.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13.     There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14.     Plaintiffs have no adequate remedy at law.

15.     Venue is proper before the United States District Court for the Northern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Ohio.

## FACTS

16.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A.     Mad River School District Board of Education**

17.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18.     The Mad River School District Board of Education is "composed of five citizens who are representatives of the residents of Saville, Beverly Gardens, Spinning Hills, Mad River Middle and Stebbins. Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of four years." https://www.madriverschools.org/BoardofEducation.aspx.

19.     The five individuals currently serving as School Board Members are Defendants Julia Denning, Ruth Newhouse, Scott Huddle, Cristina Pickle and Marilyn Scott.

20.     Defendant Chad Wyen, Superintendent of the District, holds a Masters degree in Educations, a licensure in special education and teaching, and a bachelor's degree in communication.

21.     Plaintiff's cannot confirm whether Defendant Julia Denning, the President of the School Board, holds a college degree. Ms. Denning signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as President of the School Board to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit A.**

22.     Plaintiffs cannot confirm whether Defendant Ruth Newhouse, The Vice President of the School Board, holds a college degree. Ms. Newhouse signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit B.**

23.     Plaintiffs cannot confirm whether Defendant Scott Huddle holds a college degree. Mr. Huddle signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as

In performing its legislative functions, the Board interprets needs, adopts policies, provides for personnel to carry out policies, approves activities, techniques, and the ways and means of providing financing for the adopted policies.

The Board of the Mad River Local Schools, recognizing the legal definition of its duties, considers its major responsibilities to be:

1. to establish educational goals for the schools;
2. to initiate and act upon matters of policy;
3. to select and appoint a Superintendent of Schools and Treasurer of the Board;
4. to consider and act upon the recommendations of the Superintendent of Schools in matters of policy, expenditure of funds, appointment or dismissal of employees, salary schedules or other personnel regulations, courses of study, selection of textbooks, construction and repair of buildings, and other matters pertaining to the welfare of the schools not specifically delegated as administrative responsibility by the Board of Education;
5. to provide for the preparation of and adoption of annual appropriation and budget;
6. to provide, by the exercise of its taxing power, the funds necessary to finance the operation of the schools;
7. to adopt administrative regulations and procedures for the operation of the schools under its control;
8. to appraise the effectiveness with which the schools are achieving the educational goals of the Board of Education;
9. to solicit and weigh public opinion as it affects the schools, and to inform the public concerning the progress and needs of the schools;
10. any other duties that may befall the Board of Education.

           \*\*\*

https://go.boarddocs.com/oh/mrlsd/Board.nsf/Public?open&id=policies#  (emphasis added).

      29.    In addition, the Board's Policy Manual at Section 000, Code po0121 provides,

      The United States Constitution leaves to the individual state's responsibility for public education.

      The Ohio General Assembly is under mandate by the Constitution of Ohio to provide for the organization, administration and control of a public school system supported by public funds. The Ohio State Constitution also calls for a State Board of Education and a Superintendent of Public Instruction.

      The General Assembly has outlined the duties of the State Board of Education and the Chief State School Officer. It has also established a State Department of Education (through which policies and directives of the State

Board and Superintendent of Public Instruction are administered) and has established specific types of school districts.

The Mad River City School District is classified as a city school district governed by a locally elected Board of Education, hereinafter referred to as the "Board", which is constituted and governed by Code Title 33 of the Revised Code of the State of Ohio.

https://go.boarddocs.com/oh/mrlsd/Board.nsf/Public?open&id=policies#

30.    Furthermore, for its "STATEMENT OF PHILOSPHY", the Policy Manual at Section 0000, Code po2110 declares,

> The Board of Education believes that the purpose of education is to facilitate the development of the potential of each student. ***In a free society, every individual has both the right and responsibility to make choices and decisions for himself/herself and for society. A prerequisite for every member of such a society in meeting those responsibilities is competence in the use of the rational thought processes needed to make intelligent, ethical choices and decisions. If our society, as originally conceived, is to survive and function effectively, its young people need to be prepared to exercise their rights and their responsibilities in ways that benefit them and the society. Likewise, if individuals are to be able to achieve their life goals in a free society, they need to be competent to choose among the myriad alternatives that are and continue to be available to them.***

https://go.boarddocs.com/oh/mrlsd/Board.nsf/Public?open&id=policies#

(emphasis added).

31.    The Board Policy also provides in Section 0000, po0131, in pertinent part, The Board of Education shall make such rules and regulations as are necessary for its governance and the governance of its employees and students of its grounds or premises by adopting bylaws and policies for the organization and operation of this Board and this School District and shall be bound to follow such bylaws and policies. R.C. 3313.2. Those bylaws and policies which are not dictated by the statutes or rules of the State Board of Education or ordered by the Superintendent of Public Instruction, or a court of competent authority may be adopted, amended, and repealed at any meeting of the Board, provided the

proposed adoption, amendment, or repeal shall have been proposed at a previous Board meeting and, once proposed, shall have remained on the agenda of each succeeding Board meeting until approved or rejected, except that the Board may upon a vote equivalent to that for adoption, amendment, or repeal and where compelling reasons exist, cause to suspend at any time the operation of a bylaw or policy herein contained, provided the suspension does not conflict with law, and such suspension shall terminate at the next meeting of the Board or at such earlier time as is specified in the motion to suspend. These bylaws and policies may be adopted or amended at a single meeting of the Board in an emergency. An emergency shall be defined for purposes of this rule as any situation or set of circumstances which the Board has reason to believe will close the schools or jeopardize the safety or welfare of the students or employees of the District. Any resolution adopted under emergency conditions shall expire automatically at the first public meeting of the Board following the abatement of the emergency unless the Board moves to adopt said resolution in final form. Bylaws shall be adopted, amended, repealed, or suspended by (an affirmative vote of four (4) members) (a 4/5's vote of the full Board). Policies shall be adopted, amended, or repealed by (an affirmative vote of three (3) members) (a majority vote of the full Board). The adoption, modification, repeal, or suspension of a Board bylaw or policy shall be recorded in the minutes of the Board. All bylaws and policies shall be printed in the Board policy manual. Any policy or part of a policy that is superseded by a term in a negotiated agreement shall no longer be in force and effect as a policy. The Board may adopt, amend, or repeal rules of order for its own operation by simple resolution of the Board passed by a majority of those present and voting

32.     Additionally, Mad River Board Policy adopted by the Board on September 23, 2020 and attached hereto as **Exhibit F**, explains that the Superintendent's decision to require protective facial covering during pandemic and epidemic events was made "through Board of

8

Education plans/resolution(s) in alignment with public health officials and/or in accordance with government edicts and including any Pandemic Plan developed by the District's Pandemic Response Team under Policy 8420.01." Notably, the Policy states, "***Facial masks/coverings generally should not include surgical masks*** or respirators ***unless medically indicated (as those should be reserved for healthcare workers)*** or masks designed to be worn for costume purposes." *Id.* (emphasis added).

    33.    Finally, Mad River Board Policy Section 1000, po1130, titled "CONFLICT OF INTEREST", provides, in pertinent part,

A. The proper performance of school business is dependent upon the maintenance of unquestionably high standards of honesty, integrity, impartiality, and professional conduct by Board of Education's members, and the District's employees, officers, and agents. Further, such characteristics are essential to the Board's commitment to earn and keep the public's confidence in the School District. For these reasons, the Board adopts the following guidelines to assure that conflicts of interest do not occur. These guidelines apply to all District employees, officers and agents, ***including members of the Board***. These guidelines are not intended to be all inclusive, nor to substitute for good judgment on the part of all employees, officers, and agents.

    1. No employee, officer, or agent shall engage in or have a financial interest, directly or indirectly, in any activity that conflicts or raises a reasonable question of conflict with his/her duties and responsibilities in the school system.

    2. Employees, officers, and agents shall not engage in business, private practice of their profession, the rendering of services, or the sale of goods of any type where advantage is taken of any professional relationship they may have with any student, client, or parents of such students or clients in the course of their employment or professional relationship with the School District.

\*\*\*

A. Employees, officers, and agents can not participate in the selection, award, or administration of a contract supported by a Federal grant/award if s/he has a real or apparent conflict of interest. Such a conflict of interest would arise when the employee, officer, or agent, any member of his/her immediate family, his/her

9

partner, or an organization which employs or is about to employ any of the parties described in this section, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

Employees, officers and agents can not solicit or accept gratuities, favors, or anything of monetary value from contractors or parties to subcontracts. Unsolicited items of nominal value, however, may be accepted. The Ohio Licensure Code of Professional Conduct stipulates the nominal value of gifts to be less than $25.

\*\*\*

A. Employees, officers and agents must disclose any potential conflict of interest which may lead to a violation of this policy to the School District. Upon discovery of any potential conflict of interest, the School District will disclose, in writing, the potential conflict of interest to the appropriate Federal awarding agency or, if applicable, the pass-through entity.

The District will also disclose, in a timely manner, all violations of Federal criminal law involving fraud, bribery or gratuity that affect a Federal award to the appropriate Federal awarding agency or, if applicable, the pass- through entity.

See attached **Exhibit G** (emphasis added).

## C. MRSD's COVID-19-Based Measures

34. Through Board Action 0202-060, the Board unanimously adopted the following resolution, attached hereto as **Exhibit H**:

The Mad River Board of Education recommended to adopt the suspension of community communications due to the Coronavirus as delineated in the public content section:

WHEREAS, On March 11th, 2020 the World Health Organization officially declared that COVID-19, a novel coronavirus, to be a pandemic. Shortly afterward, Governor Mike DeWine issued Executive Order 2020-01D declaring Ohio to be in a state of emergency. The Ohio Department of Health also ordered that all K-12 schools be closed to students at least through May 1, 2020. Similarly, residents have been ordered to remain at home until that date to slow the spread of the disease.

10

a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit C.**

24. Plaintiffs cannot confirm whether Defendant Cristina Pickle holds a college degree. Ms. Pickle signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit D.**

25. Plaintiffs cannot confirm whether Defendant Marilyn Steiner holds a college degree. Ms. Steiner signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit E.**

26. This five-member School Board unanimously appointed Defendant Mr. Chad Wyen to serve as Superintendent of Schools, effective August 2014.

27. As Superintendent, Chad Wyen is charged with the administration of the MRSD.

**B.    Relevant Policies of the Mad River School District Board of Education**

28. Code po0118 of Section 0000 of the School Board's policy manual, titled "PURPOSE AND DUTIES OF THE BOARD OF EDUCATION", provides,

> ***The purpose of the Board of Education is to provide the youth of the Mad River Local School District an education of the highest quality. The Board is primarily a legislative body for the government of the School District. Its role is that of a policy maker, while the actual day-to-day administration is the responsibility of the Superintendent and the staff.***

WHEREAS, on March 25th, 2020 the Ohio General Assembly passed an emergency measure through House Bill 197 which temporarily authorizes boards of education and other local government agencies to hold remote meetings during the duration of a health emergency. The provisions of HB 197 will remain in effect until December 1, 2020 or until the COVID-19 emergency ceases, whichever comes first.

\*\*\*

WHEREAS, the Mad River Board of Education continues to work diligently to address *__the many challenges that COVID-19 has caused and is likely to cause in the future as well as complying with and modeling behaviors consistent with the stay at home order.__*

NOW, THEREFORE, BE IT RESOLVED by the Mad River Board of Education that it *__suspends community communications / public comments section of its regular meeting agendas until the COVID-19 emergency ceases.__*

Exhibit H (emphasis added).

35.     In September 2021, the MRSD, through Defendant Chad Wyen, issued its "Plan for Safe Return to In-person Instruction". See **Exhibit I**. In its "Policy for Mitigation Strategies Section", the MRSD states, "We are anticipating that the health and safety protocols will continue to be practiced during the 2021-22 school year. This, of course, depends on orders from the Governor and the Board of Health. These guidelines are changing, but you can anticipate that we will require wearing masks and social distancing when in hallways, classrooms, common spaces and cafeterias." *Id.* at p. 2. The Plan also included a statement that "The City School District seeks public input regarding the District's plans for a safe return to in-person instruction for the 2021-22 school year. Please call 440.995.6800." *Id.* at p. 4.

36.     On September 2, 2021, the MRSD, through Defendant Chad Wyen, issued a Mask Recommendation to Mad River teachers, staff, parents, and students, in which the MRSD stated,

Our goals for our students, staff, and community:

● Maintain a healthy and safe environment

● Keep our students learning in person, together, in our schools

● Provide choice

Late this summer, the Centers for Disease Control and Prevention (CDC), the American Academy of Pediatrics (AAP) and Ohio Department of Health (ODH) released updated recommended guidance on the safe return to school for students and staff. There are several key takeaways that serve as the foundation for the City School District's reopening plan this school year:

**Face masks in grades Pre-K-12 are strongly recommended for our students, teachers and staff.**

➔ **Wearing a face mask may greatly reduce the risk of students, teachers and staff having to quarantine if a COVID -19 positive case/s are reported in any of our schools.**
➔ **It is your right to wear or not wear a face mask. We support either decision. Please be respectful of the choice of our students, teachers and staff.**

See **Exhibit J**. The Mask Recommendation also provides, in pertinent part,

1. As of this date, there is **no state-wide required masking mandate** for the 2021-2022 school year for staff or students.

2. **The Mad River City School District supports all students or staff members in their _choice_ to wear a face mask.** It is important to note that the Ohio Department of Health **strongly recommends** masks be worn indoors by all individuals who are not fully vaccinated (age 2 years and older). The CDC and CCBH as of August 3, 2021, now recommend that all individuals (vaccinated or not) wear a mask while indoors where community transmission is high.

*Id.* at pp. 1-2 (emphases in original). In addition, the Mask Recommendation states that

**"Wearing a face mask may greatly reduce the risk of students, teachers and staff having to**

**quarantine if a COVID-19 positive case/s are reported in any of our Mad River schools. We**

will continue to monitor the guidance and recommendations of the Centers for Disease Control

and Prevention, State of Ohio and Cuyahoga County Board of Health." *Id.* at p. 2 (emphasis in original).

37.     On September 2, 2021, Defendant Mr. Chad Wyen sent an automatic message through the one now call system to teachers, staff, parents, students and community (the "mask mandate") stating as follows:

> Earlier this week, the district issued a face mask mandate in Grades Pre-K-5 to protect our younger students who are ineligible for a COVID-19 vaccine, along with a strong recommendation for students in grades 6-12 to wear a face mask.
>
> ***The decision to issue a mandate to students 12 years and younger was supported by the survey the district conducted August 12-14th. Those survey results also indicated most parents intended for their children in grades 6-12 to wear a mask while in school.***
>
> Students returned to campus during phase-in schedules, beginning August 16th with all students on campus at full capacity on August 18th. ***During this week, school officials have observed very few students in grades 6-12 wearing face masks. This is concerning. Our priorities for this school year are to maintain the health and safety of our school community and continue learning in person, in school, together.***
>
> Therefore, pursuant to Mad River Board Policy 8450.01 Mad River City Schools will mandate face masks in all school buildings for all students, teachers, staff and visitors in grades Pre-K-12, effective Tuesday, September 7, 2021. We will review the mandate weekly and give updates at regular Board of Education meetings.
>
> ***The district's Pre-K-12 face mask mandate for students, staff and visitors in our schools is our best organizational strategy to support and protect our students' academic time and to maintain a stabilized learning environment.***
>
> \*\*\*
>
> See attached **Exhibit K** (emphases added.)

**B. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

38. In his Affidavit, attached hereto as **Exhibit O**, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

      ***

> 3.     I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as **Exhibit i**.

> 4.     I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached hereto as **Exhibit ii**.

> 5.     For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation. Recently I testified in four trials for the DuPont C-8 litigation.

> 6.     I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

> 7.     I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

> 8.     I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

> 9.     I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10. Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

11. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

13. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

14. A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

15. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

16. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20.     For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

21.     Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

22.     The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be $\geq$90%; mask were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

23.     Similarly, Shah, et al, 2021 (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

24.     Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25.     Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26.     PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27.     Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28.     For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29.     I have reviewed the Mad River City School District (MRSD) "Protective Facial Covering Policy During Pandemic/Endemic Events" as set forth in the Policy Manual of the MRSD Board of Education.

30.     Ordinary facial coverings like the ones required by the MRSD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31.     Because of the gaps around the edges of facial coverings required by MRSD's policy, they do not filter out Covid-19 aerosols.  The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32.     The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33.     Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35. Ordinary cloth facial coverings like the ones required by the MRSD mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

   a.  opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

   b.  setting fresh air dampers to maximum opening on HVAC systems,

   c.  overriding HVAC energy controls,

   d.  increasing the number of times indoor air is recycled,

   e.  installing needlepoint ionization technology to HVAC intake fans, and

   f.  installing inexpensive ultraviolet germicide devices into HVAC systems.

37.     All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

38.     Extended use of respiratory PPE is not indicated without medical supervision.

39.     As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:



**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iv, p. 25.  In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iv, p. 24.  For these reasons, students who are

18

required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

40.    In summary:

   a.  PPE is the least desirable way to protect people from very small airborne aerosols.

   b.  Facial coverings as required by the MRSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

   c.  If PPE were to be used for protection, respirators, not facial coverings as required by the MRSD policy are needed to provide any effective protection from very small airborne aerosols.

   d.  Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

   e.  Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

   f.  Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

39.    Plaintiffs note that the state of Ohio was given $4,475,243.513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.  See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit P**.  See also, https://oese.ed.gov/files/2021/07/Ohio-ARP-ESSER-State-Plan-Highlights-v2-071421.pdf. The letter links to the CDC guidelines available at

https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html. The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds. Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

40.     Plaintiff Jennifer Blankenship, in her own capacity and on behalf of her minor child, T.B., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by T.B. because T.B is required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process
## (5th and 14th Amendments) Against All Defendants

41.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

42.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

43.     In the instant case, Defendants unquestionably acted under the color of state law.

44. Each Individual Defendant is an elected, voting member of the Mad River City School District Board of Education with the exception of Defendant Mr. Chad Wyen, who is the Superintendent of the Mad River City School District.

45. Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

46. The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

47. Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

48. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

49. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process
### (Fourteenth Amendment) – Against All Defendants

50.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

51.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

52.     In the instant case, Defendants unquestionably acted under the color of state law.

53.     Each individual Defendant is an elected, voting member of the Mad River City School District Board of Education with the exception of Defendant Mr. Chad Wyen who is the Superintendent of the Mad River City School District.

54.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

55.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT III - Violation of Procedural Due Process
### (OH Const. Art. I, § 16) Against All Defendants

56.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

57.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy

by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

58.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

59.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

60.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

61.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT IV - Violation of Substantive Due Process
### (OH Const. Art. I, § 16) Against All Defendants

62.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

63.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

64.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

65.     Under Article 1, § 16 of the Ohio Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

66.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## Count V: Violation of Ohio Constitution Article 1 Section 21:

Mad River Board of Education is in direct Violation of Ohio Constitution based on Article 1 Section 21 which reads:

A. No federal state or local law shall compel, directly or indirectly, any person, employer, or health care provider to participate in a health care system.

B. No federal, state or local law or rule shall prohibit the purchase or sale of health care of health care insurance.

24

C. No federal, state or local law or rule shall impose a penalty or fine for the sale or purchase of health care insurance.

D. This section does not affect laws or rules in effect as of March 19, 2010; affect which services a health care provider or hospital is required to preform or provide; affect terms and conditions of government employment; or affect any laws calculated to deter fraud or punish wrongdoing in the health care industry.

E. As used in the section,
1."Compel" includes the levying of penalties or fines.
2. "Health Care system" means any public or private entity or program whose function or purpose includes management of, processing of, enrollment of individuals for, or payment for, in full or in part, health care services, health care data or health care information for its participants.
3. "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding or surcharge or any named fee established by law or rule by a government established, created, or controlled agency that is used to punish or discourage the exercise of rights protected under this section.

67. Pursuant to R.C. § 2319.02 – 2319.04, I, Jennifer Blankenship, being first duly sworn according to law, hereby declare, under penalty of perjury, that I have full personal knowledge of the events and matters set forth herein, and that the following is true and accurate to the best of my knowledge:

A. I am over 18 years of age and competent to make the following representations.

B. I am a citizen of the State of Ohio and have legal standing to assert my rights and my minor child, T.Bs rights, under Article 1, Section 21 of the Ohio Constitution.

C. I am asserting my rights and my minor child's T.Bs rights under Article 1 Section 21

D. Plantiff T.B is being compelled to participate in Health Care services as described under Article 1 section 21 of the Ohio Constitution.

E. Plantiff T.B is being compelled to have personal data collected by contract tracing of Covid 19

25

F. T.B is being compelled to have personal data collected daily by having to wear a face mask.

G. I, Jennifer Blankenship am being compelled to ensure TB follows these rules otherwise my child cannot attend school. **(See Exhibit R)**

## <u>RESERVATION OF RIGHTS</u>

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations of Ohio's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants. Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a. Assume jurisdiction of this action;

b. Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c. Declare that the Defendants' masking policy is void and without legal force or effect;

c. Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d. Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e. Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

f. Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.


Respectfully submitted this 20th day of September, 2021.

> */s/ Jennifer Blankenship*
> 4950 Arcadia Blvd
> Dayton, Ohio 45432
> xxx-xxx-xxx (Telephone)
> Jennifer Blankenship, Individually and on
> behalf of her minor child T.B.